UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

OKYEAME WOODARD                    CIVIL ACTION NO. 15-cv-1817

VERSUS                             CHIEF JUDGE HICKS

BURL CAIN                          MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Okyeame Woodard ("Petitioner"), a drug dealer, was kidnapped and tortured as part of a plot to rob him of cash he kept in his home. Petitioner was cut and burned, but he survived. He refused help from the police and said he would take care of the situation. Several days later, Petitioner participated in the murder of Michael Winbush, whom he accused of participating in his kidnapping and robbery. Winbush was placed in the cab of a truck, doused with gasoline, shot several times, and burned beyond recognition. Witnesses who participated in the events testified for the State, and Petitioner was convicted of second-degree murder.

Petitioner's conviction was affirmed on direct appeal. State v. Woodard, 107 So.3d 70 (La. App. 2d Cir. 2012), writ denied, 112 So.3d 837 (La. 2013). Petitioner also pursued post-conviction relief in state court. He now seeks federal habeas corpus relief on the grounds that (1) the evidence was insufficient, (2) the State withheld exculpatory material in violation of Brady, and (3) he received ineffective assistance of counsel. For the reasons that follow, it is recommended that the petition be denied.

**Sufficiency of the Evidence**

    **A. Relevant Evidence**

Shreveport Police Detective Lane Smith testified that he and a fellow detective were sent to the LSU Medical Center on October 17, 2006 to interview Petitioner, who was a crime victim. Petitioner told the detectives that he was a drug dealer, and he had been kidnapped, bound with duct tape, and tortured in an effort to gain access to $7,000 in cash he had inside his residence. Petitioner had been beaten, cut, and burned over the course of hours. He revealed to the detectives that a man named Bee-Bop was involved, but he would not otherwise cooperate. Detective Smith said that Petitioner "was very blunt that he did not want the police to proceed with the investigation, that he would take matters into his own hands." Tr. 1172-82.

Petitioner—who admitted to two prior convictions of armed robbery and one for possession of a firearm by a felon—testified at trial about his kidnapping. He said he received a phone call from a customer who said he wanted an ounce of drugs, so Petitioner delivered them to the man's home. The man pulled a gun on Petitioner and ordered him inside, where he was bound with tape. Petitioner said that there were three persons involved. A woman he did not know, a man he knew as Bee-Bop, and a masked man he did not recognize. He said they cut him on his face, chest, and arm, and they used a heated knife to cut him on the left side of his head. Petitioner eventually gave them the key that they wanted, then they hit him on the back of the head with a gun. Petitioner was knocked out, but he awoke to hear his kidnappers counting his money in another room. Petitioner was able to get loose and escape, although the kidnappers shot at him as he fled. He ran to

a nearby store, and someone called an ambulance that took him to the hospital. Petitioner denied telling the detectives that he would take matters into his own hands. He said that the detectives simply didn't look into his case once they learned he was a drug dealer. Tr. 1562-73.

Marcus Alexander, who had been convicted of multiple felonies, testified that he was a regular visitor to a house on Lamar Street where Petitioner operated as a crack dealer. Several other persons hung out there. Alexander said that he usually went there to see two other guys, Robert and Shorty. But he did speak with Petitioner on October 22, 2006, a few days after the kidnapping, which he had heard about on the street.

Alexander testified that Petitioner asked him if he knew a guy named Bee-Bop. Alexander said that he did not, but two other men who were there told Petitioner that they had seen Alexander riding around town with Bee-Bop. Petitioner confronted Alexander and told him "It's real around here, it's war," and that Alexander shouldn't be around. Alexander said he left on foot, but a car soon pulled up behind him with two men in it and called to him. Alexander refused to join them, and the passenger fired five to seven shots at him. One grazed Alexander's left shoulder, and the men sped off. Tr. 1203-11.

Edgar Winfield admitted that he was the man who shot at Alexander, using a 9 mm handgun given to him by Petitioner. Winfield was also involved in Winbush's murder. He pled guilty to aggravated battery in exchange for a 10-year sentence and his agreement to testify truthfully at Petitioner's trial.

Winfield testified that he and his nephew, Steven Miles, were at the Lamar Street crack house talking to Petitioner when Marcus Alexander arrived. Petitioner and

Alexander had a confrontation about whether Alexander had knowledge of the kidnapping. Winfield testified that Petitioner had given him a 9 mm handgun about 30 minutes earlier, "to hold it," and he took it with him as he and his nephew got in a car and went after Alexander. Winfield testified that he fired nine shots at Alexander and hit him once in the shoulder. Winfield said he returned the gun to Petitioner later that day. Winfield testified that he shot Alexander because he was afraid Alexander was going to come back to the house and try to kill him. He denied that the shooting was Petitioner's "business." Tr. 1188-1203.

Corporal Rod Johnson of the Shreveport Police Department testified that he investigated the Marcus Alexander shooting. Alexander contacted him sometime after the initial interview and said he had seen pictures of the suspects in a local newspaper after they were arrested in connection with the murder of Mr. Winbush. Johnson testified that Marcus Alexander told him that Petitioner was the person who ordered him shot. Johnson passed this information along to sheriff's deputies who were investigating the Winbush homicide. Tr. 1224-32.

Edgar Winfield also testified about the killing of Michael Winbush (a/k/a Graveyard). Winfield said he was at the Lamar Street house on October 27, 2006. Petitioner was there but left for a few minutes. Winbush arrived while Petitioner was gone, asked for Petitioner, and told one of the men to tell Petitioner that he had passed by looking for him and would be at the nearby Palomar Motel.

Petitioner returned. A man named Dean and prostitute Paige Cranford told Petitioner that Winbush stopped by, and Cranford soon left on foot in the direction of the

motel. She soon returned with Winbush, who accompanied Petitioner, Cranford, and Dean to the back of the house. Winfield testified that Petitioner was cutting up drugs on a plate when two of the other men produced guns and ordered Winbush to get on the ground. Winbush asked what was going on, and Dean "went to asking him why did he rob his boy" and "why you broke in the house." Winbush denied the accusations.

A group of the people, including Petitioner, took Winbush inside a vacant house next door. Winfield said he did not see anyone actually hit Winbush, but he saw that his head was bleeding, and Winbush's hands and feet were tied together. He never heard Winbush confess. He estimated that Winbush stayed in the house that way from 11:00 a.m. until dark. Winfield said he came and went from the Lamar Street house during that day. The record indicates that a number of other people also came and went from the house where Winbush was held.

Winfield testified that, around dark, he saw people take Winbush and put him in the bed of Winbush's pickup truck. Those men were Joseph McKinney (a/k/a Dean) and two others. Petitioner "was right there sitting by his car." Winfield got in the car with Petitioner and others, and McKinney drove the victim's pickup truck. The group traveled to an isolated area.

McKinney and Shorty then put Winbush in the cab of the truck behind the steering wheel. Winfield heard Winbush say, "Y'all told me if I tell y'all the truth y'all was going to let me go." McKinney took a gas can and poured the contents inside the truck. Shorty started shooting inside the truck from the passenger side with either a .22 or .32 caliber pistol. Shorty then took off a glove he had worn while shooting and gave it to McKinney,

who donned it and fired several shots with a 9 mm pistol that "looked just like the gun I had got from [Petitioner]." The shots ignited the gasoline, and the truck blew up. Petitioner was "standing there looking" as all this happened. Winfield said he got in the car with Petitioner, and they returned to Lamar Street. Tr. 1377-1400.

Steven Miles is Edgar Winfield's nephew. Miles accompanied his uncle to the Lamar Street house on the day of the Winbush murder. The first time he saw Winbush was inside the neighboring house, where Winbush was hog-tied on the floor with blood on his face. Miles said he asked Petitioner what was going on, and Petitioner said the man had "broke in his house and stole some dope." Miles said he later heard the man admit to breaking into Petitioner's house, and Petitioner was there when the victim said it.

Miles testified that he and his uncle rode with Petitioner in one car, while other men transported Winbush in the victim's truck. When Petitioner stopped his vehicle, the truck also stopped. Miles testified that one of the men in the group fired several rounds into the cab with a small caliber pistol. McKinney realized that the victim was not dead, so he got the gas and poured it on Winbush. McKinney then fired several shots through the driver's side door with a 9 mm pistol that he obtained from Petitioner's car, and the truck caught fire. Miles testified, as did his uncle, that the glove McKinney was wearing caught fire. McKinney threw the glove to the ground and threw the pistol in nearby woods. Tr. 1400-26.

Paige Cranford was a prostitute and crack user who often purchased drugs from Petitioner. She would sometimes stay at one of the two houses on Lamar Street where Petitioner operated. She testified that she met Mr. Winbush at the Palomar Motel on the

Page 6 of 18

day he was killed. He drove her to the Lamar Street house, where they both intended to buy crack. Cranford made her purchase and went to smoke it. As Petitioner was cutting drugs for Winbush, Cranford saw the money and plate of dope go flying, and two men with Petitioner pulled guns on Winbush and made him get on the ground. Cranford said she saw the men tie up Winbush. Petitioner told her that he was just trying to scare him. Tr. 1346-63.

Joseph Dean McKinney testified—after entering a plea bargain—that he often bought crack from Petitioner, and he was at the Lamar Street house when Winbush was grabbed by two men as Petitioner stood nearby. McKinney testified that Petitioner told him that Winbush had broken into his house. McKinney said he later drove Winbush's truck, as directed, in the expectation that Petitioner would give him cocaine. He followed Petitioner, who was driving his own car, to the site where Winbush was killed. He recalled one man pouring gasoline on the victim, and one man firing into the truck. McKinney testified that Petitioner was "just standing there looking" as the murder took place, and they all left in Petitioner's car. McKinney testified that he implicated Petitioner only after detectives told him that Petitioner had made a statement against McKinney. McKinney said he later learned this was not true. He said that his testimony at the trial was all true, and he admitted that he got a plea bargain for a charge of accessory after the fact and a five-year sentence. Tr. 1509-32.

A police officer testified that he recovered a 9 mm handgun from the woods near the murder scene. A pawn shop employee testified that her store sold that pistol to Bertha Macon. Ms. Macon testified that she had a relationship with Petitioner in 2006 and did

own a 9 mm handgun (and other handguns), which she kept in her closet. Petitioner asked her, on the night of the murder, to report the theft of her 9 mm pistol. She found that the gun was missing, and she reported it stolen. She identified the gun found at the crime scene as her gun, and she said Petitioner had known where she kept the gun. A crime lab expert testified that six spent 9 mm cartridges found at the crime scene were fired from the pistol. A pathologist testified that the victim, who was burned beyond recognition and had to be identified by dental records, was killed from multiple gunshot wounds, including one in the head and another to the heart.

Petitioner testified that Bertha Macon had sold the 9 mm pistol to someone, Petitioner got the gun from them in exchange for drugs, and he then sold it to Winfield. He denied knowing about Winfield and Miles chasing Marcus Alexander and shooting him. Petitioner said that he sold drugs to Winbush the day of the murder. McKinney pointed a gun at Winbush during the transaction, Winbush got on the ground, and Petitioner left. He never saw Winbush again. He denied killing Winbush or ordering anyone else to do so. Tr 1559-83.

### B. Analysis

Petitioner was charged with second degree murder, which state law defines as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1. Louisiana law does not require that a person personally pull the trigger to be guilty of murder. The law of principals, found in La. R.S. 14:24, provides that all persons "concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in

its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." A unanimous jury found Petitioner guilty of being a principal to second degree murder.

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993). And "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011).

The state court decided Petitioner's sufficiency challenge on the merits on direct appeal. Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). A state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard: It may not be overturned on federal habeas unless the decision was an objectively unreasonable

application of the deferential <u>Jackson</u> standard. <u>Parker v. Matthews</u>, 132 S.Ct. 2148, 2152 (2012); <u>Harrell v. Cain</u>, 595 Fed. Appx. 439 (5th Cir. 2015).

Sufficiency of the evidence was the sole issue raised on direct appeal. The state appellate court issued a lengthy decision that reviewed the evidence in great detail, set forth the relevant elements of the crime, and reviewed the challenge under the <u>Jackson</u> standard. Petitioner argued there, as he does now, that most of the witnesses against him were given plea bargains, some of their testimony differed from statements they gave police, and no witness testified specifically that Petitioner instructed them to murder Mr. Winbush.

There was evidence that Petitioner had been kidnapped and told police that he would take his own revenge. Soon afterward, one of Petitioner's associates used Petitioner's gun to shoot a man who was suspected of being associated with one of the kidnappers. A few days later, Mr. Winbush was grabbed by associates of Petitioner as Petitioner stood by. Petitioner was said to have told people that he intended to scare Winbush for breaking into his house. One witness testified that Winbush confessed to the robbery. Petitioner led the way as Winbush was driven to the scene of his murder, where he was shot with Petitioner's gun and set on fire as Petitioner stood by. Petitioner then drove all of those involved back to the Lamar Street house.

The state appellate court found that a rational juror, who viewed the evidence in the light most favorable to the prosecution, would be justified in concluding that this evidence proved that Petitioner was a principal to second degree murder. That was a reasonable application of the <u>Jackson</u> standard, so there is no basis for habeas relief on this claim. Petitioner argues that the prosecution witnesses were not credible because they were

testifying pursuant to plea bargains, but those facts were presented to the jury, and credibility determinations are squarely within the province of the trier of fact. "[U]nder Jackson, the assessment of the credibility of the witnesses is generally beyond the scope of review." Schlup v. Delo, 115 S.Ct. 851, 868 (1995).

**Brady Claim; Waived**

Petitioner's original federal petition and supporting memorandum asserted a Brady claim based on his alleged post-trial discovery of recorded statements made by Steven Miles and James Minor. Petitioner argued that the statements had not been produced in discovery and would have been helpful to the defense. The State asserted in its response (Doc. 26, p. 21) that Petitioner did not raise this claim on direct appeal or state collateral review, meaning it is subject to dismissal for failure to exhaust state court remedies. 28 U.S.C. § 2254(b)(1).

Petitioner responded by filing an amended petition (Doc. 29) and a supporting memorandum (Doc. 27) that eliminated the Brady claim. He also filed a traverse (Doc. 28) that made no mention of the Brady claim. Petitioner has effectively dismissed or abandoned the unexhausted Brady claim, so the court need not address it.

**Ineffective Assistance of Counsel**

    **A.  Introduction**

Petitioner argues that his trial attorney rendered ineffective assistance. To prevail on such a claim, Petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there

is a reasonable probability that the result in his case would have been different. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

### B. State Court Decision; AEDPA Review

Petitioner presented several ineffective assistance of counsel claims in his post-conviction application. The trial court issued a decision that cited the Strickland standard and held, generally, that Petitioner had not met his burden under Strickland. Tr. 1878-79. The appellate court summarily denied relief "on the showing made." Tr. 1949. The Supreme Court of Louisiana denied a writ application without comment. Tr. 1988. None of the state court decisions specifically discussed any of the individual Strickland claims.

Petitioner's claims were adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. Schriro v. Landrigan, 127 S.Ct. 1933, 1939 (2007). The Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it. The federal court's review is thus "doubly deferential." Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009).

"If this standard is difficult to meet, that is because it was meant to be." Harrington v. Richter, 131 S.Ct. 770, 786 (2011). Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system. Id. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id.

The state court decisions contained little analysis, but "Section 2254(d) applies even where there has been a summary denial." <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1402 (2011). "There is no text in the statute requiring a statement of reasons" by the state court. <u>Harrington</u>, 131 S.Ct. at 784. When a federal claim has been presented to the state court and that court has denied relief, it is presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. <u>Id</u>. at 784-85. There is no indication that Petitioner's <u>Strickland</u> claims were denied on procedural grounds, so the state court adjudicated them on the merits, and the claims are subject to Section 2254(d) review even though the court issued only a summary ruling that provided no significant explanation for its decision. <u>Id</u>.

### C. Uncalled Witnesses

Petitioner argues that counsel should have called three witnesses— James Minor, William Henry Mason, and Trina Jefferson—who would have been favorable to the defense. He repeats this argument under the headings of "right to present a defense" and "compulsory process." The underlying arguments are the same, so the claims will be addressed together.

James Minor told a detective that men had already grabbed Winbush and dragged him inside the house next door before Petitioner arrived at the scene. William Henry Mason told an investigator that he was present at the Lamar Street house on the day Marcus Alexander was shot, and Petitioner was there and acting nervous. Petitioner suggests that Mason would have testified that the shooting was based on an unrelated dispute, which would be inconsistent with the State's revenge theory. Finally, Petitioner argues that Trina

Jefferson would have helped the defense. The record is to the contrary. Ms. Jefferson told police that Petitioner had been bragging about the incident. He told her and her boyfriend that he kidnapped a man, bound him, shot him, and burned his body in the man's truck, as revenge for a previous incident where the man broke into his house.

"[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2000). In addition, for Petitioner to demonstrate the requisite Strickland prejudice, "[he] must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial." Id. Evans reversed a district court that had granted habeas relief on a similar Strickland claim. The district court was faulted for assuming that witnesses, from whom no affidavits were presented, would have testified favorably for the defense. See also Cox v. Stephens, 602 Fed. Appx. 141, 146 (5th Cir. 2015) ("Cox has failed, through affidavits or otherwise, to demonstrate that these witnesses would have testified; identify the content of their testimony; or support that their testimony would have been favorable.") and Bruce v. Cockrell, 74 Fed. Appx. 326 (5th Cir. 2003)(rejecting Strickland claim because petitioner "did not submit any affidavits by the uncalled witnesses themselves, or offer any evidence that they would have been willing to testify at the punishment phase of his trial.").

Petitioner did not submit to the state court any affidavits that suggest the proposed witnesses were willing and able to testify. In any event, the statements that Petitioner points to do very little, if anything, to undermine the State's case. There were multiple witnesses who placed Petitioner at the center of the relevant events, and these proposed

witnesses would do little to challenge the principal aspects of their testimony. Trina Jefferson's testimony would have actually been quite harmful to the defense. The state court's rejection of this ineffective-assistance claim was a reasonable application of <u>Strickland</u> to the record, so habeas relief is not permitted.

### D. Failure to Challenge Unlawful Arrest

Petitioner contends that he was arrested based largely on the statement of Trina Jefferson. He argues that her "unsupported information" did not provide probable cause for his arrest, so counsel was ineffective for not challenging the arrest. Trina's statement, as summarized above, provided police with ample probable cause to arrest Petitioner. The investigation notes indicate the police also had a witness who described a blue and white car with a unique paint job parked near the murder scene at the time of the crime, and another witness told police that Petitioner drove a car with that custom paint job. Tr. 63-64. There were no valid grounds to quash the arrest, so counsel was not ineffective for not attempting to do so. The state court's rejection of this claim was a reasonable application of <u>Strickland</u>.

### E. Video of Arrest

Petitioner argues that defense counsel should have subpoenaed video from police car recording systems to show that police made an "aggressive illegal arrest" and unconstitutionally explored his car and person. Petitioner represents that a search of his car produced no evidence of the crime, and he does not point to any evidence introduced by the State at trial that came from the search of his person or car. Thus, even if counsel had demonstrated that aspects of the search incident to arrest were unlawful—and there is

no indication that was the case—there would have been no evidence to suppress as a result. And the fact that an arrest involved the use of force, even excessive force, is not a defense to murder. Counsel did not render ineffective assistance in this regard, and the state court reasonably applied Strickland to reject this claim.

### F. Other Crimes Evidence

The State filed a pretrial notice of intent to use "other crimes" evidence that Petitioner was a drug dealer and sold drugs from a house on Lamar Street, he was kidnapped and tortured, he directed two cohorts to kill Marcus Alexander in revenge, and Michael Winbush was kidnapped from the Lamar Street house after he came to buy drugs from Petitioner. Tr. 957. The trial court held a hearing to assess the admissibility of the evidence under state evidence law. Defense counsel argued that the State's argument fell short and would confuse the jury. The trial court disagreed and gave extensive reasons for finding that the evidence fit under Louisiana Code of Evidence art. 404(B) to show motive, plan, and intent. Defense counsel noted her objection. Tr. 1150-53.

Petitioner argues that defense counsel was ineffective because she did not succeed in quashing this "other crimes" evidence. Petitioner complains that defense counsel "blatantly refused to object or move for a mistrial" in response to the other crimes evidence. The record, though, shows that counsel did make an appropriate challenge to the admission of the evidence. The trial judge overruled her objection. The fact that counsel did not succeed did not render her performance ineffective. The trial court reasonably allowed the evidence, and the appellate court was reasonable when it rejected this final Strickland claim.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14)

days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

  THUS DONE AND SIGNED in Shreveport, Louisiana, this 21st day of June, 2018.

Mark L. Hornsby
U.S. Magistrate Judge